**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

      Plaintiff,

              v.

ROBERT FLAXMAN,

      Defendant.

Case No. 1:19-cr-10117-IT

Leave to File Granted on 10/11/2019

## DEFENDANT ROBERT FLAXMAN'S SENTENCING MEMORANDUM

**I.**    **Introduction**

The government has described this as a case of wealthy and entitled parents seeking to cement their children's social status (and their own) by using illegal means to get them into elite schools at the expense of other children. But that is not an accurate description of the nature and circumstances of Robert Flaxman's criminal conduct. He committed the ACT cheating offense for his daughter ███████, but it was not to get her into an exclusive school, and it had nothing to do with social status, ego-gratification, or even giving his daughter her heart's desire. It was a desperate and ill-conceived effort to help ███████████████████████████████████

███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

- 1 -

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. But ██████ 's checkered

high-school career, disciplinary record, modest grades, and poor ACT score made admission to

any four-year college unlikely.  ████████████████████████████████████████

████████████████████████████████████████████████████████████████

He was desperate enough to commit a crime to help ensure that happened – an inexcusable decision

he regrets and will regret for the rest of his life.

The manner in which Robert committed this crime was not especially egregious by the

measures the Court has identified.  He did not seek to get his daughter additional time to which

she was not legitimately entitled.  He engaged in only the testing scheme, on only one occasion,

and did so only to increase his daughter's score from a 20 to a 28 – enough to help ensure she

could attend *a* college, but not an elite one.  He did not intentionally involve his daughter in the

cheating (although Riddell did so without his knowledge).  And although he paid more than some

others, it was not so much more that he would necessarily have viewed the crime as being any

more serious than they did.

Robert also accepted responsibility for his crime immediately after he was arrested.  Within

days of his arrest he offered to meet with the prosecutors in this case and tell them everything he

had done, as well as everything he knew about the Varsity Blues  matter.  (They took him up on

the offer.)   He did not seek to minimize his culpability with them, and he has never done so with

anyone, as letters attached to this memorandum attest.  And he pleaded guilty at the earliest

opportunity.  Because he was not in the press limelight, he did not make or release a public

statement; but Robert has not hesitated to confess his guilt and remorse to anyone, including

family, friends, neighbors, and business associates.

Robert makes no excuses for his conduct. He knew his actions were illegal when he took them. And he knows that he was no more entitled to break the law to help his daughter than any other parent whose child is at risk. But desperate people do desperate things. He is ashamed that he was weak when most others facing similar situations remain strong; and he is deeply apologetic for putting his own interests over those of other students and parents who play by the rules no matter what the consequences. This decision was completely out of character for him, and he will never do anything like this again.

We ask the Court to take the particular nature and circumstances of Robert's offense into consideration when crafting an appropriate sentence. Robert did not believe that his children were entitled to attend an elite school (or any particular school at all) because of his wealth and privilege. He and his ex-wife both attended community college; neither graduated. He was a chiropractor for five years before he entered the real estate business and eventually became very successful at it. He would have been perfectly happy for his daughter to attend community college or go straight to work if that would have ██████████████████████. He viewed sending her to a residential college as ████████████████████████, not the next rung on the social ladder. He asked Rick Singer (who had previously provided legitimate counseling to his son) just months before the application deadline where ██████ could realistically expect to get into college, and Singer replied, "nowhere." Only then, feeling out of options and increasingly desperate, did Robert make the terrible decision to break the law.

We respectfully submit that Robert's reasons for committing this offense, and his manner of committing it, make him the least culpable of the parents who have pleaded guilty, and that a sentence of time-served followed by a term of supervised release with appropriate conditions would constitute a just and sufficient punishment. It would be a sentence at the low end of the

guidelines range as calculated by the Court – an appropriate sentence in a test-cheating case for a

first-time offender who was not motivated by entitlement or personal enrichment.  And it would

not undermine the goal of general deterrence.  Robert is only one of 11 codefendants charged with

conspiring to defraud colleges and educational testing services; not all of the codefendants need to

go to prison to convey the moral seriousness of that crime.  Given the nature and circumstances of

his commission of the offense, a prison sentence would be "greater than necessary" to achieve all

of the goals of sentencing.  *See* USSG § 3553(a).

**II.**  **The 18 U.S.C. 3553(a) Factors Make a Non-Incarceration Sentence Appropriate.**

   **A.  Nature and Circumstances of the Offense[1]**

   Robert and Kristine Flaxman were married in 1996 and had two children, ██████ (now 22)

and ██████ (now  20).  ████████████████████████████    ██████████████████████

████████████████████████████████████████████████████████████████████████████

and the couple divorced in 2005.  Although they shared custody of the children, Robert effectively

became a single parent, raising his son and daughter even as he worked to build his business and

helped care for an elderly father.  ████████was extremely attached to her mother and never wanted

to leave her side, █████████████████████████████████████████████████████████

████████████████████████████████████████████████  In 2011, ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████  Robert obtained full custody of both children, ███████

███████████████████████████████████████████████████████████.

---

   [1]   The facts in this section are generally documented in paragraphs 80-81, 83-85 of the
PSR, and in Exhibits A and B-1 through B-5.



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

████████████████████████████████ Robert's entire life outside of work was organized around managing a family in distress. His teenage son, ████, became despondent after ████'s abrupt departure from the home: ████ already seldom saw his mother, ████████████████, and now he no longer had his sister, who had always been the family's most dynamic member. ████████████████████████████████████. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

███ Flaxman was so sad after ███ 's departure that Robert became worried about his ability to focus on college entrance exams and applications. Robert himself was not sophisticated about the college admissions process, so he looked for a college counselor and was eventually introduced to Rick Singer. Singer provided ███ some test prep and work books and helped him with his applications. ███ eventually applied ordinary-admission to a handful of schools and was accepted at several, including the ████████████████████████████████████ ████████████████████████████████[2]

By the fall of 2016, ████████████████████████████████████ was coming to terms with the past and had begun thinking about her future. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. ███ that meant not returning home to old patterns and people, and instead doing something that would engage her and give her a sense of purpose.

After ██████████ enrolled in USD, ███ began to express an interest in going to college herself. Robert was thrilled with this development ████████████████████ ████████████████████████████████ ████████████████ ████████████████████████████ ████████████████

---
2 ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████. ██████ visited some colleges and became enthusiastic about the University of San Francisco, a Jesuit school, because of its social justice mission. She also took an interest in ████████████████████, because her brother was there.

Unfortunately for ██████, she was ill-equipped to get into any college. She had moved from program to program during high school and had missed a semester altogether. She had a checkered disciplinary record and modest grades. ██████████████████████████████ ███████████████████████████████████████████████. She also struggled with standardized tests. ████████████████████████████████████████████. The first time she took the ACT, she became so anxious that she could not complete it and scored only a 20.

████████████████████████████████████████████████████████

████████ Robert eventually reconnected with Rick Singer to see if he could provide counseling remotely. Singer advised Robert that with ████'s spotty record █████████████████████ █████, she was unlikely to get into any school unless she boosted her ACT score substantially. It was then that Singer told Robert he could arrange for a higher score.

Singer did not explain to Robert exactly how the ACT scheme worked, but Robert knew it was probably illegal. He assumed Singer had someone on the payroll at the Houston testing site who would correct ██████'s answers after the fact. Singer assured Robert that ██████ would take

the test herself and write her own essay so she would not know about the cheating. Robert, for his part, did not tell ███ that the test was rigged or the reason she would be taking it in Houston; he learned only after ███ completed the test that Riddell had involved her in the cheating on his own initiative. (Evidently, Riddell did this solely to save himself time: if he "took" the test with the student instead of afterwards, he only had to "take" it once.) ███ was accepted at the University of San Francisco and enrolled in the fall of 2017.

## B. History and Characteristics of the Defendant

Robert Flaxman is 63 years old. He has a partner he loves, three children he adores, and an extended family he gladly supports. Although Robert is now wealthy, he is not a child of privilege. He was born in New York City into a working class family. (PSR ¶¶ 71-72). When he was five, his parents divorced, and he and his brother saw their father only a few days each month after that. (PSR ¶ 72). Things were hard: his father struggled to meet his child support obligations, and his mother worked a series of jobs to try to make ends meet. (*Id.*). Robert and his brother were left to navigate a dangerous neighborhood, largely on their own. (*Id.*).

Robert's mother found a new partner when Robert was 12 and they moved the family to Los Angeles. (PSR ¶ 73). The relationship eventually grew rancorous, and Robert left home at 17. (*Id.*). He spent several months homeless, sleeping in a treehouse or with friends, and showering in his high school locker room. (*Id.*). He cut off contact with his mother after high school but returned four years later when she developed breast cancer to nurse her through her final months. (*Id.*). She died when he was 21.

Despite the lack of family support, Robert worked hard to advance his education and better his life. After graduating high school, he spent two years at a nearby community college and then transferred to USC, but despite working nights he had to drop out after three semesters because he

could no longer afford it.  (PSR ¶ 101).  A few years later he went back to school for a chiropractic degree and then worked as a chiropractor from about 1983-88.  (PSR ¶ 102).  During that period he learned about the real estate business, which became his passion and vocation.

For over 25 years, Robert has been the owner and operator of Crown Realty Development, which has transformed and improved a variety of communities through visionary real estate development efforts.  (PSR ¶ 103).  Letters submitted on his behalf attest to the positive impact Robert's projects have had on the communities they serve, such as turning a "boarded-up, rat-infested jumble of 40-plus buildings" into a "vibrant and mixed-use community … that serves as a hospitality and cultural center" for an entire community, and "employs hundreds in good jobs." (Ex. B-13 (Carpinelli letter)).  Kirk Adams, an Arizona civic leader who is working with Robert on a transformative development project, writes:  "I would not be working with Robert if I was not convinced that he cares deeply about people and wants to improve their lives."  (Ex. B-14 (Adams letter)).

Robert also has devoted many hours and considerable resources supporting families and children in need.  (*See, e.g.*, PSR ¶ 91).  David Heil is a board member of Miracles for Kids, an organization devoted to raising money to aid families with children suffering from critical or terminal illnesses.  (Ex. B-11 (Heil letter)).  Mr. Heil writes that Robert not only contributed hundreds of thousands of dollars to the organization but "arranged to personally visit the families with his ex-wife and children and brought each family additional items, such as food, clothing and other necessities."  *Id.*  Robert has also generously supported Chai Life, a national organization that helps catastrophically ill children and their families, for more than 15 years.  (Ex. B-12 (Sohacheski letter)).  A member of the organization who has known Robert for 30 years writes that "[h]elping children in need means something to Robert in a profound way."  (*Id.*)

Robert's generosity to friends and family is boundless. Kristine Flaxman notes:

> I think it is important to understand the type of man Robert is. Despite my shortcomings, Robert never abandoned me and has also provided for me, even when I could not do so myself. When my sister left her husband with her two young children, ██████████████████, Robert immediately offered for me to have a home large enough to support them all. Robert constantly provides for the entire family, his father until his death, his father's widow until she remarried, my sister, her kids, and others.

(Ex. B-2 (Kristine Flaxman letter)). Similarly, Nora Groat, who has known Robert since 1993, writes: "I would like the Court to know how much we all depend on Robert, not just for our jobs, but also the financial support he provides for many in the family in times of need." (Ex. B-5 (Groat letter)). Others echo those sentiments, writing that Robert is "kind, generous, loyal, and moral" (Ex. B-6 (Gary Flaxman letter)), and a "man of immense generosity, kindness and inclusiveness" (Ex. B-8 (Emigh letter)).

Robert is also regarded by friends and colleagues as honest, trustworthy, and a person of the utmost integrity. Kirk Adams, the Arizona civic leader, writes that Robert is "an honest person who inspires trust and confidence in others," and who "cares deeply about people and wants to improve their lives." (Ex. B-14 (Adams letter)). Rick Carpinelli, a colleague for 15 years, expresses the same sentiment: "In my fifteen years of working with [Robert] I have known him to be honest to a fault, always insisting on full disclosure, honest dealings, and keeping one's word. People trust him because he earns their trust, and because they sense that he cares about them." (Ex. B-13 (Carpinelli letter)).

### C. Just Punishment

A non-incarceration sentence is a just punishment for a first-time offender in a standardized test case like this one, where the offender's motivations and methods, while not excusable, do not warrant outrage. Robert committed this crime because he was

desperate, not status-seeking, ambitious, or entitled; and his desperation was not merely "the bewilderment, anxiety and insecurity" that the government contends "every parent goes through." Felicity Huffman Sentencing Tr. at 11:23-12:5. It was the desperation of a parent ████████████████████████████████████████████ ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

He should have found another alternative that did not require breaking the law. That goes without saying. But all criminals make bad choices; the reason Robert chose badly in this case should matter in deciding on a just sentence.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. To ensure that she would land in a safe environment (as he saw it), he decided to break the law, even though it meant treating others' children unfairly. These circumstances do not excuse the offense but they do affect its nature and seriousness and bear on the appropriate punishment.

Finally, Robert has already suffered enormous consequences as a result of his arrest and guilty plea, and those consequences are likely to worsen after he is sentenced. ████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ He will also suffer all of the other collateral consequences of a felony conviction for the rest of his life. A non-incarceration sentence followed by a period of supervised release with appropriate conditions would hardly constitute giving him a "pass" under the circumstances.

### D. General Deterrence

A prison sentence for Robert would be "greater than necessary" to "promote respect for the law" and "afford adequate deterrence to criminal conduct" under the circumstances of this case. 18 U.S.C. 3553(a). The government has argued that only a prison sentence will deter wealthy parents who in its view feel so entitled to spots at elite colleges that they are "not content with the distinct advantages they already enjoy[] in the admissions process." The Court echoed that sentiment when it sentenced a codefendant, noting that, in "a system that is already so distorted by money and privilege in the first place . . . you took the step of obtaining one more advantage to put your child ahead of theirs. And I think that is the reason that general deterrence matters in this case." Felicity Huffman Tr. at 39:18-40:4.

Robert's offense was not an expression of entitlement, and he should not be sentenced as if it had been just because he is a codefendant in this case. Robert did not buy his daughter an inflated ACT score to gild an already burnished college resume; she had no college resume to speak of. His goal was not to get her into to an exclusive college; he just wanted her in any college where she could live in a supportive environment, stay engaged, and have a sense of purpose. This was not a crime committed to increase her status – or his.

Indeed, Robert has never been a status-seeker for his children or himself. He and his ex-wife never obtained undergraduate degrees. He was a chiropractor before he was a businessman. He does not covet board seats, club memberships, or other tickets into high society. His charitable

work has tended to be low-key. His wealth certainly benefitted his children, but he did not act as if it entitled them to attend an elite college – or entitled him to purchase a fraudulent ACT score for that purpose. To treat him as if it had would be unfair. Robert's sentence should not be a vehicle for sending a message to the entitled when his conduct in this case was not motivated by a sense of entitlement.

Furthermore, as noted above, Robert is only one of 11 codefendants who have pleaded guilty in this case to defrauding colleges and educational testing services. Not all of the codefendants need to go to prison to convey the moral seriousness of that crime. Courts routinely sentence coconspirators to widely varying sentences even though every sentence must be "sufficient" to "afford adequate deterrence to criminal conduct." *Id.* The deterrent effect of this case will not be undermined merely because one codefendant with special circumstances did not receive a prison sentence.

### E. Specific Deterrence

Robert does not need to be imprisoned to protect the public from further crimes. He is a first-time offender who never did anything like this before and never will again. He accepted responsibility immediately after his arrest, giving a full and candid account of his conduct to the prosecutors and pleading guilty at the earliest opportunity. And he continues to accept full responsibility and blame without hesitation or equivocation, as his relatives, friends, and colleagues all attest. His colleague, Mr. Carpinelli, writes:

> I have worked closely with Robert since his arrest. He immediately accepted responsibility for his actions, did not try to diminish their seriousness, and did not seek to blame others. I have seen him candidly explain to our counterparties what he did, the fact that he pled guilty, and the punishment he is facing. Without exception, all of our counterparties continue to trust him and believe him. They know who he really is and that this was an aberration.

(Ex. B-13 (Carpinelli letter)).

Others say much the same thing:

- "Since meeting Robert, I have seen him admit his guilt and take full responsibility for his crime. Although he did it for the sake of his daughter, who was troubled, he knows it was wrong and does not try to justify it." (Ex. B-14 (Adams letter));

- "I know that Robert is remorseful and has not diminished his role or what he did wrong." (Ex. B-11 (Heil letter));

- "Robert has taken full responsibility for his actions. He's embarrassed, sad, and full or remorse. What Robert did is completely out of character for the man I have known for over 25 years." (Ex. B-5 (Groat letter));

- "He is deeply remorseful and has asked for no sympathy nor sought to blame others. He knows what he did was wrong." (Ex. B-8 (Emigh letter));

- "I can also say I observed great remorse from Robert. His acceptance of responsibility was clear, and he spoke of the terrible lapse in judgment that has brought shame and pain to the whole family." (Ex. B-1 (Green letter)); and

- "I know Robert has pled guilty and I have personally seen his remorse and acceptance of his guilt without diminishment." (Ex. B-2 (Kristine Flaxman letter).)

### F.  Need to Avoid Unwarranted Sentencing Disparities

A non-incarceration sentence would help avoid unwarranted sentencing disparities because the nature and circumstances of Robert's offense conduct make him less culpable than the other parents who have committed the ACT cheating offense. The bullet points below address the key

factors the Court has identified as relevant to sentencing, as well as additional mitigating factors that so far apply exclusively (or at least with special force) to Robert's case.[3]

1. Neutral factors

- Although Robert paid Singer $75,000 – more than some – the difference does not indicate that he went to any greater lengths to commit the crime than they did, or would have viewed it as any more serious.

2. Mitigating factors

- Robert committed only the ACT testing offense, with only one child, only once.

- He did not seek out Singer to engage in fraud. He had used Singer to provide legitimate college counseling for █████'s older brother and then reconnected with him to provide legitimate counseling services to █████. Singer, knowing of █████'s limited options, undoubtedly saw Robert as easy prey.

- His active participation in the crime was extremely limited. He asked Singer to provide college counseling for █████ in late August 2016. By then she had already taken the ACT and gotten a 20. █████ took the test with Riddell approximately eight weeks later, on October 22. Robert's only active involvement was to tell █████████████ that he wanted them to switch the test location to Houston because he and █████ would out there anyway visiting schools (which was not true).

---

[3] In drawing direct comparisons between Robert's case and others', we do not seek to undermine their appeals for leniency or cast doubt on the legitimacy of those appeals; we are simply taking our cue from the Court, which at a recent sentencing hearing indicated that such a direct comparison would assist the Court in fashioning an appropriate sentence.

- Robert did not seek to get ▓▓▓ additional time to which she was not already entitled; her need for extra time on the ACT was real and not manufactured at Singer's suggestion. He also did not threaten or harass ACT to release her score.

- He did not intentionally involve his daughter in the crime. Singer told Robert that ▓▓▓ would take the test herself and write her own essay, and that she would know nothing about the cheating. Riddell decided on his own to involve ▓▓▓ (and the other girl who was present) in the cheating in order to save himself the time and effort of having to correct their answers after the fact. Although Robert bears ultimate responsibility for her involvement, all of the other parents put their own children in harm's way to the exact same extent; that Riddell decided to involve his daughter in the cheating and not their children is not a measure of his culpability.

3. <u>Additional Mitigating Factors</u>

- Robert did not purchase a phony ACT score to give a child who already had all the advantages the one additional advantage she needed to get into an exclusive school. ▓▓▓ is an excellent school, but its 2018 acceptance rate was 65% for regular admission and 76% for early admission.[4] Even the government does not classify it as "selective," let alone "highly selective." (Dkt. 312, Flaxman Information, ¶¶ 17-19). The point here is not that committing ACT fraud is okay if your goal is admission to a non-selective school, but rather that Robert's commission of the crime was for humble motives, and his actions were in keeping

---

[4] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

those motives.  He was not seeking to increase his daughter's status or his own, or to give her the competitive advantages that flow from attending an elite university; he was desperate, and he committed an act of desperation that happened to involve college admissions.

These facts make Robert's offense conduct less serious than others'.  Although the defendants in some other cases were under varying levels of stress themselves and acted to help children facing various kinds of headwinds, their ultimate goals appear to have been the same:  to equip their children with the kinds of standardized test scores that would entitle them to admission at the most elite schools (or drama programs) in the country.  That, as the Court has observed, is "why there was a sense of [public] outrage in this case."  Huffman Tr. at 39:6-8.  "The outrage is [that in] a system that is already so distorted by money and privilege in the first place . . .  you took the step of obtaining one more advantage to put your child ahead of theirs."  *Id.* at 39:18-40:3.  Robert did not do that.  His conduct is inexcusable, but it was less outrageous.

- Individuals who commit mail fraud (or conspire to do so) by paying imposters to take a standardized test for them are routinely sentenced to probation or time served despite having guidelines ranges much higher than 0-6.  Many of the factors that distinguish the Varsity Blues case from those cases do not apply to Robert.  Incarcerating him would create unwarranted in that sense as well.[5]

---

[5]  *See, e.g., United States v. Chau*, 17-cr-00221 (E.D. Pa. 2017); *United States v. Han Tong*, 15-cr-00111 (W.D. Pa. 2017); *United States v. Xi Fu*, 15-cr-00111 (W.D. Pa. 2015); *United States v. Jia Song*, 15-cr-00111 (W.D. Pa. 2017); *United States v. Yudong Zhang*, 15-cr-00111 (W.D. Pa. 2017); *United States v. Yue Zou*, 15-cr-00111 (W.D. Pa. 2017); *United States v.  Biyuan Li*, 15-cr-00111 (W.D. Pa. 2017); *United States v. Songling Peng*, 15-cr-00111 (W.D. Pa. 2017); *United*

### G. Rehabilitation

In keeping with the Court's view that rehabilitation should include community service that involve "hands on" work with individuals in need, we propose that one condition of supervised release be 250 hours of community service at the Pico Youth and Family Center ("PYFC") in Santa Monica, California. As explained in the letter submitted by PYFC's president, Oscar de la Torre, PYFC serves the city's most vulnerable youth through a variety of services, including tutoring and career readiness. (Ex. A-15 (de la Torre Letter)). Nearly 90% of the youth are low-income youth of color who come from single-parent families and are either first-generation high school and/or community college students. (*Id.*) Mr. Torres notes that Robert's "history as a self-made business man, pulling himself up by his bootstraps from a challenging youth" make him a good fit to provide services to PYFC's clientele. (*Id.*) He also notes that PYFC has long "provided the court with supervised community service opportunities as a form of restitution for individuals who are a fit for our center, and we understand the monitoring and reporting requirements of such court-directed arrangements." (*Id.*)

(cont'd)

---

States v. Qifan Chen*, 15-cr-00111 (W.D. Pa. 2017); *United States v. Yue Wang*, 17-cr-10237 (D. Mass. 2017); *United States v. Shikun Zhang*, 17-cr-10251 (D. Mass. 2017); *United States v. Leyi Huang*, 17-cr-10255 (D. Mass. 2018); *United States v. Xiaomeng Cheng*, 17-cr-10225 (D. Mass. 2017); *United States v. Xinyan Wang*, 17-cr-10402 (D. Mass. 2018); *United States v. Alkaabi*, 02-cr-778 (D.N.J. 2002); *United States v. Alsugair*, 02-cr-779 (D.N.J. 2002); *United States v. Hany al Hedaithy*, 02-cr-379 (D.N.J. 2002); *United States v. Egija Kuka*, 11-cr-462 (D.N.J. 2011).

III.    **Conclusion**

For all of these reasons, we respectfully request a sentence of time-served (consisting of the time Robert spent in custody on the day of his arrest) followed by a two-year period of supervised release with appropriate conditions, including 250 hours of community service, and an appropriate fine.


Date: October 11, 2019                          Respectfully submitted,

                                                ROBERT FLAXMAN,

                                                By His Attorneys:

                                                /s/ William D. Weinreb
                                                William D. Weinreb (BBO #557826)
                                                Michael T. Packard (BBO #676934)
                                                Quinn Emanuel Urquhart & Sullivan, LLP
                                                111 Huntington Ave, Suite 520
                                                Boston, MA 02199
                                                (617) 712-7100
                                                billweinreb@quinnemanuel.com
                                                michaelpackard@quinnemanuel.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s) filed under seal on paper will be served on counsel of record via electronic mail on October 11, 2019, and that redacted versions will be filed through the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 11, 2019.

/s/ William D. Weinreb
William D. Weinreb